**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2827-17T3

ALEIDA GINES,

     Plaintiff-Appellant,

v.

ANTONIO GINES,

     Defendant-Respondent.

_____

        Submitted December 3, 2019 – Decided  December 11, 2019

        Before Judges Fisher and Rose.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1229-13.

        Susan B. McCrea, attorney for appellant.

        Gruber, Colabella, Liuzza & Thompson, attorneys for respondent (Chris Harry Colabella, on the brief).

PER CURIAM

After forty years of marriage, the parties divorced in October 2013; the judgment incorporated a property settlement agreement (PSA). Like many other cases, the divorce judgment failed to end the court's involvement with these parties. Soon after entry of judgment, the court was embroiled in post-judgment applications that eventually resulted in a January 18, 2018 order, portions of which plaintiff Aleida Gines now appeals. Specifically, she appeals the denial of her requests to: enforce litigant's rights; allow an expert's interview of the parties' youngest child[1] for the purpose of reunifying Aleida with the child; require defendant Antonio Gines to reimburse her as a result of her need to address financial problems he allegedly caused; and to require Antonio to produce proof of life insurance policies as required by the PSA. For the reasons that follow, we remand for a plenary hearing.

I

To explain our resolution of these issues, we necessarily recount some of the procedural history that preceded the order under review. We start with the PSA itself, and its relevant provisions.

---

[1] They have three children. The oldest two are emancipated; the third was born in 2009.

 A-2827-17T3

First, the parties stipulated they would share legal custody of the minor child and that Antonio would be the parent of primary residence. Aleida was allowed parenting time on alternate weekends and other periodic time during the week with the child that would not be:

> impacted by either party's physical location <u>unless one party moves out of State</u>, making the alternate weekend schedule impractical.
>
> [Emphasis added.]

Second, the PSA obligated Antonio to pay Aleida alimony of $130,000 per year, and he agreed to waive any right to modify the amount in the future for any reason. Antonio also agreed to pay for Aleida's car expenses. In addition, Antonio agreed to provide:

> medical and dental insurance coverage for [Aleida's] benefit . . . in a form and manner presently in existence . . . subject to the provisions of the Affordable Care Act. [Antonio's] obligation herein shall be limited to a monetary contribution of $800.00 per month. The aforesaid obligation shall continue until [Aleida] becomes eligible for Medicare, at which time [Antonio's] obligation shall be to pay the premiums which may become due for a Medicare supplemental plan . . . .

Third, the PSA acknowledged the existence, at the time of the divorce, of insurance policies on Antonio's life, for Aleida's benefit, in the approximate amount of $1,400,000. The PSA declared that Aleida:

3

may, at her election, take ownership of and be responsible for all premium payments due on the aforesaid policies . . . . In the event [Aleida] chooses not to take ownership of, pay the premiums on, or abandons her right to continue to pay the premiums on the policies . . . then, in that event, [Antonio] shall have the right to undertake that responsibility and designate the beneficiary or beneficiaries of his choice, and [Aleida] shall have no claim to the proceeds therein. [Antonio] shall produce and deliver Schedule A designating the life insurance policies and the paid up status of the policy and the face page within fifteen (15) days of the date of this Agreement.

Fourth, the PSA provided strictures regarding the parties' income taxes and an apparent tax problem in the years preceding the divorce. A PSA provision made Antonio:

solely . . . responsible for any and all taxes, both personal and business, which have been levied by either the Federal and/or State governments and which liens are noted in Schedule B[2] hereof and are not intended to be the exclusive listing.

That same provision made Aleida "responsible for her personal returns for 2010, 2011 and 2012" and required that Antonio keep Aleida "apprised of the status of his tax negotiation as he becomes aware of any new developments." The following section of the PSA contained stipulations that would support any

---

[2] Schedule B was not included in the record.

claim by Aleida that she was an "innocent spouse" with regard to earlier tax returns.

II

To explain the relevance of the provisions referred to in Section I, we briefly describe the motions filed thereafter as well as their dispositions.

In September and November 2013, Aleida's attorney wrote to Antonio's attorney requesting the life insurance policies required by the PSA. A motion was filed and, on April 18, 2014, the court ordered Antonio to produce proof of the policies within fourteen days but denied without prejudice Aleida's requests for enforcement of the income tax provisions.

Aleida relocated to California in early 2014. In September 2015, the trial court denied Antonio's request for sole custody of the minor child pending a "best interest evaluation"; the court did, however, stay Aleida's contact with the child pending the evaluation.

That same September 2015 order directed Antonio:

- to "pay directly to providers for [Aleida's] medical bills incurred because of a lapse in health insurance coverage" and to contact the providers within fourteen days of Aleida providing a release authorizing him to discuss the debt. Aleida's "request that [Antonio] shall immediately obtain upgraded health insurance in the same form and manner presently existing at

the time of the parties' divorce, pursuant to . . . the [PSA]" was denied because plaintiff would be eligible for Medicare in December. And Aleida's request for sanctions because of Antonio's failure to maintain health insurance for her as required by the PSA was denied.

- to pay all taxes and penalties due "within a reasonable time" and to "provide monthly updates with respect to this debt."

- to obtain a quote for a $1.4 million life insurance policy within thirty days and "provide proof" to Aleida, after which "she shall determine whether or not she will pay the premiums."

A November 2015 order modified the September 2015 order in some respects. First, the court denied Antonio's request for sole custody of the minor child but granted "legal residential custody" to Antonio and confirmed he would continue to be the parent of primary residence. The earlier order that called for a "best interest evaluation" was vacated, but a clinical psychologist, Thomas Golden, was "appointed to evaluate the parties and [the minor child] with respect to any request made by [Aleida] to have contact with the minor child." Golden was also ordered to address Aleida's request for daily telephone or Skype contact with the child as well as Aleida's request for visitation in New Jersey or California up to six times per year. The order repeated the provisions of the September 2015 order regarding Aleida's medical expenses and health insurance

6

and Antonio's responsibility to provide a quote for life insurance, pay income taxes, and provide a monthly update on the taxes.

In September 2016, the motion judge denied without prejudice Aleida's motion to enforce litigant's rights but ordered Antonio to provide a payment plan for Aleida's medical bills within sixty days and ordered Antonio to "provide reimbursement and ongoing monthly payments of [Aleida's] Medicare B and/or F benefits." Antonio was also ordered to provide proof of all Social Security wages paid while Aleida was employed by him and to provide proof that he was timely addressing the tax issue. In addition, the motion judge denied without prejudice Aleida's requests to: sanction Antonio for his failure to maintain medical insurance for her; require Antonio to immediately provide a quote for life insurance and sanction him for each day he failed to comply; require Antonio to pay amounts due to the Internal Revenue Service and sanction him for each day he failed to comply; require Antonio to reimburse her $7500 paid to Optima Tax Relief; and require Antonio to reimburse $2461.20 paid to an accountant "to refile W-2's and prior tax returns for [Antonio's] failure to make standard payroll deductions from [Aleida's] pay." The judge rejected Aleida's request to remove Golden as the reunification expert but directed Golden to issue a

preliminary report as soon as possible. The parties were ordered to submit Case Information Statements (CIS) by November 18, 2016.

Golden issued a preliminary report on October 12, 2016, the contents of which are the subject of a protective order. We will only briefly refer to its contents in a general way to preserve the parties' and the child's privacy. Golden relied on, among other things, the considerable time that elapsed since Aleida, who had moved to California, had engaged in consistent maternal caretaking of the child and her unwillingness to move to New Jersey, in recommending that reunification not occur "in its typical format." He recommended against communication by telephone, email and Skype without there first being a re-establishing of a relationship between Aleida and the child.

As the result of another motion, the trial court entered an order in April 2017: denying Aleida's request to establish a reunification schedule; requiring Antonio to make alimony, car lease and expense payments, and payments for plaintiff's Medicare plan through probation; denying Aleida's request that Antonio be held in violation of litigant's rights for his failure to pay her medical expenses; directing Antonio to provide Aleida with proof of payment, arrangements for the payment of her medical expenses estimated at $68,827.50, plus late fees and penalties, by April 28, 2017; compelling Antonio to submit an

A-2827-17T3

updated CIS by April 28, 2017; requiring that Antonio's failure to provide proof of the payment arrangements or submit a CIS "may subject [Antonio] to sanctions/counsel fees"; and denying without prejudice Aleida's requests for reimbursement of $4830 in accounting fees incurred to resolve outstanding tax issues, $2492 in counsel fees incurred to unfreeze a safety deposit box, and $8900 paid to Optima Tax Relief.

Aleida's attorney reached out to Golden regarding what would be needed to commence reunification therapy. Ultimately, Golden suggested a conference call, stating to Aleida's attorney that "I trust that you have read my report to the [c]ourt that was quite specific as to the most appropriate regime for the initiation and then the follow-thru"; he emphasized that the report "will be a central theme during our conference call." A conference call took place on June 22, 2017, and Golden then stated that "he would not support any continued attempts at reunification."

In fact, on July 23, 2017, Golden issued a report, which concluded that "reunification should no longer be considered by the [c]ourt," opining that such attempts would be harmful to the child. He based this on his belief that the child's relationship with Aleida was non-existent and the child has "flourishe[d] in a complete nuclear family unit, that includes a brother, sister, niece, uncle and

Father."  Golden further opined that "any introduction" of Aleida "would certainly generate confusion, and stress for" the child.  He observed that Aleida was also estranged from her two emancipated children and that "[t]he entire negative dynamic that exists between [Aleida] and other family members cannot be ignored"; he added that the child's "world is complete," and "any attempt at reunification with [Aleida] who is clearly a total stranger would cause only ill effects" for the child.

III

With this past as its prologue, Aleida moved in September 2017 for relief that produced the January 18, 2018 order under review.

In her motion, Aleida sought an order that would:  (1) hold Antonio in violation of the orders entered in September 2016 and April 2017 for failing to establish a payment plan for her medical bills and to impose sanctions for such failure; (2) hold Antonio in violation of those same orders for failing to submit a CIS; (3) permit her to hire her own expert to address reunification; (4) compel Antonio to reimburse her $4284 in accounting fees incurred to resolve outstanding tax liability issues, $2441.10 in counsel fees incurred to unfreeze a safety deposit box, and $8990 paid to Optima Tax Relief to restore her credit and to advance $7000 towards future accounting fees; (5) compel Antonio to

reimburse her $220.77 per month effective May 20, 2017, for amounts garnished from her social security income for outstanding tax obligations; (6) compel Antonio to provide written proof that he complied with his obligation under the PSA to provide her with information regarding his life insurance policies; (7) compel Antonio to pay her attorney's fees; (8) compel Antonio to sell the properties owned by him to satisfy debts owed to her or on her behalf; and (9) establish a discovery schedule and date for a plenary hearing.

Antonio cross-moved for an order that would allow Golden to prepare an updated report if the court was inclined to consider Aleida's request for an additional expert. He also sought an award of attorney's fees.

On the return date, the judge noted that it had been 467 days since Antonio was first ordered to set up a payment plan for Aleida's medical bills, but he found it "a stretch" to conclude that failure was willful. The question was not so much Antonio's unwillingness to pay but his ability to pay. Antonio, in fact, expressed that he was considering bankruptcy.

As for Aleida's request to hire an expert, the judge expressed the following view:

> You cannot have a relationship when you are across the country. [Aleida] resides in California, [the child] lives in New Jersey. How in God's name are you going to have reunification unless a person is available

for frequent, regular contact with the child and/or with the therapist to establish reunification.

Dr. Golden's report, to cut to the chase, is basically – this is something that can't be done at this point in time. If [Aleida] relocated to New Jersey, perhaps this would be something that would be accomplished but with a bi-coastal relationship, it's impossible to do.

. . . I don't see how subjecting [the child] to further interviews and evaluations is in his best interest. From what I read, he is a happy, smart, thriving eight year old, he's in a stable and loving family unit. Dr. Golden notes in his – July of 2017 report that [Aleida] and [the child] have zero relationship whatsoever to the extent that [the child] does not even recognize pictures of [Aleida] nor recall her presence during his infancy.

He calls this instance circumstance, reintroduction as opposed to reunification given [Aleida's] and [the child's] lack of relationship. He concludes the report by saying I believe that any further attempts at reunification would be akin to emotional child abuse.

For those reasons, since there is nothing that's really changed since this was last . . . reviewed and ordered, I intend to decline to have this child be subjected to any further interviewing and evaluations until there's a significant change in circumstances involving [Aleida] where she will have an opportunity to have this relationship.

[I]f [Aleida] wants to retain Dr. Singer, that's up to [her], do whatever you want, but I certainly, at this juncture, based on this information, I am not going to

subject this child to more interviews. I don't see any good that can come out of it.

The judge further commented that:

I'm not going to preclude her from getting an expert if she wants, but I'm not going to order that this child be evaluated until the experts can confer with each other and let's not lose sight of the end game, the goal is trying to have this child's rights protected to have a relationship with [Aleida] if it is appropriate.

As for Aleida's request for reimbursement of fees paid to her accountant, Jelena Black, the judge concluded that the information provided was insufficient to allow for a determination "that these fees were attributable to . . . actions taken or not taken by [Antonio]." Aleida blamed the lack of clarity on Antonio's failure to have his accountant respond to Black's report, which had been available to Antonio since July 2017; on the other hand, Antonio's attorney argued that the best approach would be for the accountants to confer. The judge denied Aleida's request for reimbursement of accountant's fees but ordered the accountants to confer.

The judge also denied Aleida's request for reimbursement of funds garnished from her Social Security income based on her contention that the garnished amounts related to tax liabilities for one of Antonio's businesses. Antonio asserted that the garnishment was a result of Aleida's failure to pay

taxes on the alimony she received. The judge concluded that "the accountants [should] figure that out because somebody's gotta look at this and try to straighten it out. I have no idea." Aleida's attorney agreed with this approach "as long as my client can be reimbursed if indeed it's [Antonio's] responsibility." The judge responded that if it turned out to be Antonio's "responsibility, the accountants are going to tell us that. If it's not, they're going to tell that and if one says yes and one says no, then we got a question of fact which can only go through a hearing."

Aleida also acknowledged that Antonio had provided a quote for life insurance as required by the September 2015 order, but she claimed Antonio never provided information for the policies in existence when the PSA was executed. Aleida argued that Antonio inaccurately represented to the court that the policies existing at the time of the divorce lapsed. She also claimed that the premium on the existing policy was $4000, while the quote provided for the new policy was $8000. The judge determined that the issue had been dealt with in the September 2015 order. He denied relief because Aleida neither moved for reconsideration nor appealed that part of the September 2015 order.

The judge also denied Aleida's request for attorney's fees she claims were incurred to unfreeze a safety deposit box. The judge reasoned that although

14

Aleida's name was on the box, so too was her paramour's; in fact, her paramour owned the safety deposit box and the fees were billed to him. The judge also denied Aleida's request for reimbursement of fees paid to Optima Tax Relief, finding that Aleida "fail[ed] to demonstrate how or why [the fees paid to Optima Tax Relief] should be [Antonio's] obligation." And the judge held that he would "entertain [Aleida's] application to order the sale of [Antonio's] properties" after receiving reports from the accountants.

The judge explained:

> The issue is a mess, it's gotta be straightened out and nobody is taking the bull by the horns until today. These parties have to figure this out, which is why . . . [Antonio's] going to talk with his accountants to get in touch with [Aleida's] accountant, his accountants are going to meet with potential bankruptcy attorneys to determine what can be done in that regard, the attorneys are going to be advised of what's going on because I said there's going to be a date certain when the written reports are going to be given to the two of you, then I'll figure it out. I can't do that . . . with what I've got here . . . . I'm not a CPA.

The judge commented further that if Antonio refused to comply with a legitimate request Aleida should "come back to [c]ourt." He declined to schedule a case management conference, stating that would not occur unless a plenary hearing was ordered.

15

To summarize, the January 18, 2018 order, as it relates to the issues on appeal: denied Aleida's request to hold Antonio in violation of the September 2016 and April 2017 orders; denied as moot Aleida's requests regarding Antonio's CIS because the CIS had been filed; granted Aleida's request to hire her own expert but ordered, in the interim, that "[t]he minor child shall not be interviewed or required to participate in this evaluation without prejudice to further application"; denied Aleida's request for reimbursement of accountant fees and an advance for future fees "without prejudice as [it] ha[d] insufficient information to determine that the fees were incurred as a result of [Antonio's] actions or inactions"; "direct[ed] that the accountants for each party shall confer with one another and work together by February 28, 2018 to resolve the tax issues of the parties including providing one another with necessary documents and each shall provide a succinct updated report as to the status of the tax issues by that date"; denied Aleida's request for reimbursement of amounts garnished from her Social Security income "pending the outcome of the conference between the accountants"; denied Aleida's request for proof of the life insurance policy referenced in the PSA; denied her request for attorney's fees related to the safety deposit box; denied Aleida's requests for reimbursement of amounts paid to Optima Tax Relief and attorney's fees for prior applications; denied her

16

fee request for the current application without prejudice; determined that Aleida's request to compel a sale of Antonio's properties was "premature" because the court had "not yet determined the obligations of the parties and is awaiting the accountants to confer"; and denied a discovery schedule or a plenary hearing, finding it "premature pending the outcome of the accountants conferring."

Soon thereafter, Aleida's counsel attempted to obtain documents and schedule the accountant conference directed by the judge but did not receive a seasonable response. Aleida also claimed Antonio did not make any payments or arrangements to pay her medical expenses; she wrote to the judge on February 8, 2018, asking for a conference. She then filed a notice of appeal, divesting the trial court of jurisdiction. R. 2:9-1(a).[3]

IV

Aleida appeals various provisions of the January 18, 2018 order, arguing:

> I. THE COURT ERRED IN FAILING TO FIND [ANTONIO] IN VIOLATION OF [ALEIDA'S] RIGHTS FOR HIS NON-COMPLIANCE WITH COURT ORDERS AND ERRED WHEN IT FAILED TO IMPOSE SANCTIONS, IMPOSE ARREST/IN-CARCERATION AND COMPEL THE PAYMENT OF

---

[3] We assume without deciding that Aleida had a right to appeal any of the provisions in question. To the extent the January 18 order lacked finality, we grant leave to appeal nunc pro tunc.

A-2827-17T3

COUNSEL FEES FOR [ANTONIO'S] NON-COMPLIANCE WITH COURT ORDERS.

A. The Court Erred In Failing To Compel Payments And A Payment Plan For [Antonio] To Pay Over $68,000 Of Medical Bills In [Aleida's] Name Resulting From His Violation Of The PSA And Four (4) Enforcement Orders As Well As Failing To Find [Antonio] In Violation Of Litigant's Rights And Imposing Sanctions Including But Not Limited To Counsel Fees, Arrest/Incarceration, Discovery And The Sale Of Properties/Asset[s] Of [Antonio] To Satisfy The Debt.

B. The Court Erred In Not Finding [Antonio's] Failure To File His [CIS] With Attachments To Be "Willful" In Spite Of Two Orders Compelling Him To Do So And Failed By Not Imposing Sanctions, Counsel Fees Or Other Consequences For His Failure To Abide By The Orders To File His CIS.

II. THE COURT ERRED BY REFUSING TO ALLOW THE PARTIES['] CHILD TO BE INTERVIEWED BY [ALEIDA'S] CUSTODY/PARENTING TIME/REUNIFICATION EXPERT.

III. THE COURT ERRED IN ITS REFUSAL TO COMPEL [ANTONIO] TO REIMBURSE [ALEIDA] FOR COSTS INCURRED BY HER AND PAID TO THIRD PARTIES TO CORRECT FINANCIAL ISSUES CAUSED BY [ANTONIO'S] NON-COMPLIANCE WITH THE [PSA].

A. Reimbursement Of $4,284 For Jelena Black, CPA Accountant Fees Incurred From June, 2016 To June, 2017 To Correct IRS And State And Social Security Tax/Debt Issues And An Advance Of $7,000 Of Fees For Additional Necessary Work.

B. Reimbursement Of $2,441.10 Of Fees Spent . . . To Unfreeze The Levy On The Safety Deposit Box Of [Aleida's Paramour] . . . Where [Aleida] Has Co-Access.

C. Reimbursement Of $8,990 Paid To Optima Tax Relief To Restore [Aleida's] Credit/Correct Her Tax Obligations.

D. Counsel Fees And Costs.

IV. THE COURT ERRED IN REFUSING TO COMPEL [ANTONIO] TO PROVIDE [ALEIDA] WITH EVIDENCE THAT HE GAVE [ALEIDA] THE CHANCE TO PAY FOR LIFE INSURANCE ON HIS LIFE IN ACCORDANCE WITH [THE PSA].

V. THE COURT ERRED IN NOT PROVIDING CONTINUING CONTROL AND FOLLOW UP OF THE OPEN ISSUES OF THE CASE BY PROPER CASE MANAGEMENT.

In explaining why we are remanding for further proceedings on these issues, we need not burden the record much further. We only briefly synopsize our view of the issues and the path forward.

19

## VI

Indeed, in remanding for further proceedings, we express no view of the merits of Aleida's arguments or Antonio's responses to them. Instead, we conclude that the pending issues between these parties would benefit from a more hands-on approach by the able trial judge even though we find little to criticize about his determinations in the January 18 order.

To be sure, Antonio has not complied with certain aspects of the PSA, as Aleida argues in Point I, but we agree with the judge's determination that it was not discernible from the record whether those failures were willful or simply a result of an alleged inability to pay. Those, as well as any other related relevant questions, should be explored at an evidentiary hearing. Limited discovery may be permitted as well.

In Point II, the judge permitted the involvement of an expert to be retained by Aleida for the purpose of pursuing her contention that she and the minor child may or should engage in reunification therapy or other similar process. Aleida, thus, argues only that the judge erred in temporarily precluding the expert's interview of the child. We agree with the thrust of the judge's decision that what Aleida seeks is premature. Aleida's expert should first provide a specific plan for going forward before any such interview occurs; the judge correctly deferred

to Golden as to the harm even an interview might cause and it is incumbent on Aleida's expert to first opine on that issue – perhaps followed by an evidentiary hearing if Golden does not agree – before the child is required to submit to an interview.

We also agree with the trial judge's assessment of the issues posed in Point III. The issues are, to say the least, convoluted and it expects too much to require that the judge wring sense out of such a confusing set of circumstances without further clarification. The judge was not far from the mark when he characterized what had been presented to him on these issues:

> [Aleida] goes through and she has her accountant prepare a 162[-]page document, which is filled with gobbledygook as I go through it. The meat of everything that her accountant is . . . putting in there is in the first nine pages. She's got all these papers that are associated with it, I'm supposed to try to figure this all out, I'm not an accountant. It's up to the person who's making the motion to demonstrate to the [c]ourt with clarity and succinctness what's going on. The only thing that came out of that is this is a disaster. It is a mess.

While the judge's "gobbledygook" characterization may have been colored by the case's difficulties and the contentious atmosphere, it is undoubtedly true that a judge is not required to take on the role of accountant when parties fail to adequately explain tax issues and their consequences. The judge's approach

A-2827-17T3

toward resolving the confusion – that the accountants confer – was quite sensible. Such an approach could lead to a resolution of the dispute, or at least a limiting or clarifying of the issues. To the extent the conference does not resolve or pare down – or present in an understandable fashion – the claims, the judge always retains the power to appoint his own expert at the parties' expense.

We part company with the able judge in that we believe he made the mistake of leaving it to the parties to cooperate. We conclude instead that the judge should have ordered an evidentiary hearing and allowed compulsory discovery on these issues, and we remand for those purposes. The judge should also actively monitor the parties' efforts to confer, rather than leave the matter to the filing of additional motions. Some cases simply require a greater hands on approach, and this seems to be one of them.

Point IV relates to disputes about Antonio's compliance with the PSA's life insurance provision. Like the trial judge, we find uncertainty in the parties' factual contentions about whether Antonio was in compliance with the PSA, and we direct that these issues be made part of the anticipated plenary hearing on the other issues.

A-2827-17T3

Because we remand for a plenary hearing[4] on the issues presented in Points I, III and IV, we need not address Aleida's assertion in Point V that the judge erred in not holding a case management conference. The judge's decision not to conduct a case management conference – on the ground that he hadn't yet ordered a plenary hearing – was a matter resting well within his discretion. That particular issue is now moot because we conclude that a plenary hearing is required.

* * *

To summarize, we remand for compulsory discovery and a plenary hearing – or hearings – on the issues raised in Points I, III, and IV. As for the issues raised in Point II, whether a plenary hearing is warranted depends on what is presented by Aleida's expert. A preliminary question concerns whether, or under what circumstances, the child may be interviewed. Ultimately, we assume Aleida's expert will provide a report. A plenary hearing need not be ordered by the trial judge until it is determined there are factual disputes or disagreements between the experts that need to be resolved on the reunification issues. But, at

---

[4] The judge need not resolve all these issues at a single plenary hearing. The judge may, in the promotion of efficiency, find it more expeditious to convene hearings on issues as they become ready for disposition. We leave the management of the case to the judge's discretion.

A-2827-17T3

the preliminary stages, the judge should remain available for reasonable requests seeking his intervention in ensuring the issues are expeditiously resolved.

Remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2827-17T3